William E. **BROCK**, Secretary of Labor, Plaintiff,

v.

**EL PASO NATURAL GAS COMPANY**, Defendant.

No. EP–80–CA–340.

United States District Court, W.D. Texas, El Paso Division.

July 15, 1986.

Robert A. Fitz, Office of the Solicitor, Dallas, Tex., for plaintiff.

Kenneth R. Carr, Grambling, Mounce, Harold H. Young, Jr., Office of General Counsel, El Paso, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

HUDSPETH, District Judge.

This civil action was instituted by the Secretary of Labor to enjoin alleged violations of Section 15 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 215, and to restrain the withholding by the Defendant of the payment of overtime compensation allegedly due to certain of its employees. Jurisdiction in this Court is founded upon Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217. The parties have stipulated to the relevant facts, and only questions of law are presented for decision by the Court.

Defendant El Paso Natural Gas Company is an energy company engaged in the production, refining, transportation and selling of petroleum products. Among its business activities is the transportation of natural gas in interstate commerce by means of a pipeline that crosses the state boundaries of Texas, New Mexico, Arizona and California. The parties have stipulated that, at all times relevant to this lawsuit, the Company was an "employer" as defined in the Fair Labor Standards Act, 29 U.S.C. §§ 203(r) and 203(s).

At various locations along its natural gas pipeline, the Defendant has placed satellite pumping stations. The function of the satellite pumping station is to furnish power to move the gas through the pipeline. The only employees as to whom claims are asserted in this case are Repairmen (Chief Plant Mechanics) and Operators at twenty-two of these satellite pumping stations. Repairman or Chief Plant Mechanic is the title given to the lead employee at each satellite station. He has the overall responsibility for the operation of that satellite station, and he in turn is subject to the supervision of a Complex Superintendent located at a "mother station". All satellite stations except two have either one or two Operators working under the supervision of the Repairman. The exceptions are the Largo Station, which has three operators, and the Lindrith Station, which has four operators. The job duties of Repairmen and Operators include general maintenance and upkeep of the equipment and physical plant.

These satellite pumping stations are located in isolated areas, most of them many miles from the nearest community. All Repairmen and Operators are required to live in housing furnished by the Company and located on the same property as the satellite station itself. Each house is equipped with an alarm system which, when triggered by some malfunction, notifies the employee of a problem at the satellite station.

Each Repairman and Operator works a regular eight-hour day. Normal working hours are from 7:30 a.m. to 4:00 p.m. with a one-half hour break for lunch. Each employee works a five-day week, but their workdays are staggered so that each station is manned seven days a week.

The legal controversy in this case arises from the fact that one of these employees is required to be "on call" every night between 4:00 p.m. and 7:30 a.m. the next morning. When a particular employee is on call, he must stay at home or within hearing of the alarm bell in his house. He can eat, sleep, read, watch television, or invite friends to visit in his home. He cannot, however, leave the premises to go into town, go out to dinner, go to the movies, nor visit friends at any location other than his satellite station. If the alarm sounds during his hours on call, he responds by going to the building where the machinery is housed and endeavoring to correct the problem.

At each satellite station, a duty roster is maintained so that all employees are aware as to which one is on call that particular evening. The Complex Superintendent or someone under his supervision at the mother station is also informed of the identity of the employee on call at each satellite station. In fact, the Complex Superintendent retains the authority to veto any scheduling of which he does not approve, although that authority has rarely, if ever, been exercised. The employees at each satellite station are free to "trade off" assignments among themselves, so long as one person is on call every night and so long as the mother station is informed as to the identity of that employee. The purpose behind the Company rule requiring that one employee be on call at every satellite station every evening is to protect the Company's equipment from vandalism and theft and to insure continuous and safe operation of the satellite station. Employees on call are not paid wages nor overtime compensation by the Company unless they are actually called out to answer an alarm. In that event, the employee is paid overtime compensation at a rate equal to one and one-half times his normal hourly wage for all time spent in responding to the alarm.

If an on-call employee needs or desires to leave the satellite station on a particular evening, and if he is unable to work a trade off with any other employee at the same station, his instructions are to telephone the mother station and ask for relief. In the event the on-call employee has to wait until the arrival of his reliefman, the Company pays him overtime compensation for the time he spends waiting for the arrival of his relief. In the case of a "personal emergency" (a term which is not defined), the on-call employee is entitled to leave the station immediately without waiting for his reliefman to arrive. So long as the on-call employee arranges for relief, he is permitted to leave the satellite station for purely personal reasons, such as going into town to attend a dance, a rodeo, or a football game.

Based upon the data to which the parties have stipulated, alarms have not been frequent. The great majority of the time, the on-call employee at each satellite station is able to eat his meals and get a night's sleep without interruption.

Neither Repairmen nor Operators at satellite stations occupy entry-level positions. Each of these employees has voluntarily accepted assignment to his satellite station from some other position in the Company. At the time of his assignment to the satellite station, each of these employees was informed of the Company policy requiring at least one employee to be present and on call at the site at all times. With the exceptions previously noted, the Company does not consider on-call time to be work time for which the employees are entitled to wages or overtime compensation under the Fair Labor Standards Act. It is the Secretary's position that on-call time is work time for which the employee is entitled to compensation under the Fair Labor Standards Act.

■ Almost since the inception of the Fair Labor Standards Act, the courts have recognized that "waiting time" may also be "working time" for purposes of the Act. *Skidmore v. Swift & Company*, 323 U.S. 134, 136, 65 S.Ct. 161, 162, 89 L.Ed. 124 (1944). In each case the court must resolve the question whether the employee was engaged to wait, or whether he was waiting to be engaged. *Skidmore v. Swift & Company, supra* at 137, 65 S.Ct. at 163. The resolution of this question in a particular case

> ... involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances.

*Skidmore v. Swift & Company, supra* at 137, 65 S.Ct. at 163. In the instant case, the circumstances outlined in the stipulated facts point to a finding that the "on-call" time is work time. During his on-call hours, each employee is restricted in his

movements to the extent that he cannot leave his duly assigned satellite station unless he first makes his own arrangements for a replacement. He must remain within hearing of the alarm, and be prepared to respond to any emergency. During these periods of time he is on duty; his "duty" is to stand and wait. *Missouri, K. & T.R. Co. v. United States*, 231 U.S. 112, 119, 34 S.Ct. 26, 27, 58 L.Ed. 144 (1913).[1] In *Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944), a case presenting facts very similar to those in the instant case, the Supreme Court stated at page 133, 65 S.Ct. at 168:

> Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a standby capacity. Readiness to serve may be hired, quite as much as service itself and time spent lying in wait for the threats to the safety to the employer's property may be treated by the parties as a benefit to the employer.

When "idle time" is spent predominantly for the benefit of the employer, not the employee, such time is compensable under the terms of the Fair Labor Standards Act. *Armour & Company v. Wantock, supra; Marshall v. Partida*, 613 F.2d 1360, 1363 (5th Cir.1980).

 The fact that the employee's duty of waiting was performed in his own home does not change the result. Under the proper circumstances, an employee's home may be his designated duty station. See *Allen v. United States*, 1 Cl.Ct. 649 (1983), *affirmed*, 723 F.2d 69 (Fed.Cir.1983). In the instant case, each employee was required as a condition of his employment to live in a house owned by the employer at the employer's remote satellite station. It is clear from the facts in this case, that, during the employee's on-call hours, this "home" was his designated duty station. The fact that his duty station was also his home is significant in only one respect: eating and sleeping time should be excluded. Both of these activities could be pursued comfortably in the employee's living quarters, and they were interrupted by actual alarms only on rare occasions. The Court finds that eight hours of each on-call period should be excluded from the calculation of overtime. *Skidmore v. Swift & Company, supra* 323 U.S. at 139, 65 S.Ct. at 164. The remaining 7.5 hours of each on-call period should not be excluded

> ... because there is nothing in the record to suggest that, even though pleasurably spent, it was spent in the ways the men would have chosen had they been free to do so.

*Skidmore v. Swift & Company, supra* at 139, 65 S.Ct. at 164. The unpaid overtime compensation due to each employee should therefore be calculated on the basis of 7.5 hours per on-call period, less any overtime compensation previously paid to that employee as a result of his having been called upon to answer alarms during that particular evening or morning.

The recent decision of the Fifth Circuit in *Allen v. Atlantic Richfield Co.*, 724 F.2d 1131 (5th Cir.1984), cited by the Defendant, does not point to a different result in the instant case. In *Allen*, refinery guards who were represented by a union made a special agreement with their employer to live on the refinery premises twenty-four hours a day while a strike by other workers was in progress. The agreement negotiated between the employer and the employees' union called for the guards to work twelve-hour shifts, rather than the normal eight-hour shifts, and to be paid for those twelve hours at an hourly rate which was $3.00 higher than their normal wage. The rest of the agreement was that the "off-duty" guards would remain on the premises and sleep there in order to be available for emergencies which were beyond the abilities of the on-duty shift to handle. The Fifth Circuit recognized that the evidence raised a fact question as to whether all the guards' free time, including sleeping and

---

**1.** See also Milton, "On His Blindness"; I Samuel 30:25–26.

eating time, was spent predominantly for the employer's benefit, which would entitle them to overtime compensation under the Fair Labor Standards Act. *Allen v. Atlantic Richfield Co., supra* at 1137. Nevertheless, the court held that evidence supported the jury's finding that Atlantic Richfield and its employees had negotiated an enforceable agreement whereby twelve hours out of each twenty-four hour period would be considered non-work time. *Allen v. Atlantic Richfield Co., supra* at 1136. The factual distinctions between the *Allen* case and the instant case seem obvious. In *Allen*, the agreement between Atlantic Richfield and its refinery guards covered a temporary period only, to wit: the duration of a strike by refinery workers. Furthermore, the agreement between employer and employees was specifically negotiated through a collective bargaining process. In return for the guards' agreement to stay on the refinery premises twenty-four hours a day, the employer agreed to pay them for twelve hours a day rather than the usual eight and at a wage rate $3.00 an hour higher than the usual one. No comparable facts appear in the record of the instant case. The holding in *Allen* is simply not applicable to the instant facts.

An action under 29 U.S.C. § 217 to enjoin an employer from withholding payment of unpaid overtime compensation must be commenced within two years after the violation occurs, unless the violation was willful, in which case the action may be commenced within three years after the cause of action accrued. 29 U.S.C. § 255(a). An employer acts "willfully" in withholding overtime compensation if he knows or has reason to know that his conduct is governed by the Fair Labor Standards Act. *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir.1974); *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir. 1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Phrased another way, the violation is willful if the employer knew that the Fair Labor Standards Act was "in the picture". *Coleman v.*

*Jiffy June Farms, Inc., supra.* In the instant case, the Defendant concedes that its actions, if found to violate the Fair Labor Standards Act, meet the Fifth Circuit's definition of "willfulness".[2] In light of the Supreme Court decision in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), however, it is necessary for the Court to consider whether the Fifth Circuit definition of willful remains viable. The TWA case involved the interpretation of Section 7(b) of the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), which permits a prevailing plaintiff to be awarded liquidated damages only in cases of willful violations. In deciding that case, the Supreme Court expressly rejected, for liquidated damages purposes, the Fifth Circuit's "in the picture" standard in favor of a more stringent willfulness standard, to wit: whether the employer knew or showed reckless disregard for whether the Age Discrimination in Employment Act prohibited its conduct. *Trans World Airlines, Inc. v. Thurston, supra*, 105 S.Ct. at 624–25. In reaching this conclusion, the Supreme Court relied at least in part upon the fact that the liquidated damages provision in the Age Discrimination in Employment Act was intended to punish the employer. The Court did not hold that the "in the picture" standard was inappropriate in the context of a nonpunitive statute of limitations, such as 29 U.S.C. § 255(a). *Trans World Airlines, Inc. v. Thurston, supra*, 105 S.Ct. at 625. Although the issue has not come before the Fifth Circuit again since the TWA case was decided, two other circuits which follow the Fifth Circuit definition of willfulness in the context of the statute of limitation have held that the decision makes no change in the law. *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1117 (4th Cir.1985); *Secretary of Labor v. Daylight Dairy Products, Inc.*, 779 F.2d 784, 789 (1st Cir.1985). This Court must, therefore, continue to defer to the Fifth Circuit's "in the picture" standard, and find that the Defendant's actions in this case

**2.** Defendant's Brief, p. 2 n. 2.

were "willful" under the Fifth Circuit test. The Defendant was certainly aware that the Fair Labor Standards Act was applicable to the employees in question in this case; in fact, it paid them overtime compensation for hours which the employer chose to classify as "overtime". Therefore, the three-year statute of limitation applies, and unpaid overtime compensation which accrued on or after November 19, 1977 must be paid.

The Court must next consider whether the employer is further liable for liquidated damages. Title 29 U.S.C. § 216(b) provides that an employer who violates the Fair Labor Standards Act is liable not only for the payment of the unpaid overtime compensation, but for an additional equal amount in the form of liquidated damages. If, however, the employer can show to the court's satisfaction that it acted in good faith and that it had reasonable grounds for believing that its conduct did not violate the Fair Labor Standards Act, the court may, in its sound discretion, award no liquidated damages, or award liquidated damages in an amount less than the unpaid overtime compensation. 29 U.S.C. § 260. The "good faith" requirement is a subjective one which focuses upon the employer's intent to do right or to do wrong in terms of the Act. *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3rd Cir.1984). The "reasonable belief" requirement, on the other hand, imposes an objective standard by which the employer's conduct is to be judged. *Williams v. Tri-County Growers, Inc., supra.* The employer has the burden of proving both the good faith and reasonable belief elements required by Section 260. *Reeves v. International Tel. & Tel. Corp.*, 616 F.2d 1342, 1352 (5th Cir.1980); *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir.1979). Good faith requires the employer to investigate its potential liability under the Act, and ignorance cannot form the basis for a reasonable belief. *Reeves v. International Tel. & Tel. Corp., supra* at

1353; *Barcellona v. Tiffany English Pub, Inc., supra* at 469. Lack of good faith is demonstrated when an employer knows or has reason to know that his conduct is governed by the Fair Labor Standards Act. *Reeves v. International Tel. & Tel. Corp., supra* at 1353; *Brennan v. Heard, supra.* On the other hand, the employer may sustain his burden of proof under Section 260 by demonstrating that he outrightly and candidly engaged in the conduct shown to be a violation of the Act but did so under a mistaken, although reasonable, belief that the conduct was in conformity with the law. *Martinez v. Food City, Inc.*, 658 F.2d 369, 376 (5th Cir.1981); *Reed v. Murphy*, 232 F.2d 668, 678 (5th Cir.1956), *cert. denied*, 352 U.S. 831, 77 S.Ct. 45, 1 L.Ed.2d 51 (1956). Finally, even if the employer does show both good faith and reasonable belief, the court may, in its discretion, award liquidated damages. *Castillo v. Givens*, 704 F.2d 181, 183 n. 1 (5th Cir. 1983); *Martinez v. Food City, Inc., supra* at 376.

Determining the issues of good faith and reasonable belief from a stipulated record is not easy, but it is not impossible. The Plaintiff and the Defendant in this case have filed an extensive stipulation of facts with exhibits attached, and have thoroughly briefed the legal issues involved, citing the applicable administrative regulations and relevant case law. These materials demonstrate that, during the relevant time period, the Defendant openly and candidly announced and defended its overtime pay policies with respect to these employees. For example, on March 1, 1978, the Defendant promulgated and published an official policy document in which it stated its position as to which hours would be classified as work time for overtime pay purposes.[3] Thereafter, between May 15 and May 29, 1979, a bulletin board notice was posted at all twenty-two of the satellite stations involved in this case informing all employees of the Company's position regarding overtime pay.[4] These actions

---

3. Stipulation of Facts, Attachment A.

4. Stipulation of Facts, Attachments B and C.

verify that the Defendant was not secretive in its conduct, but was forthright and candid in announcing and defending its interpretation of the law. These facts support a finding of good faith. Furthermore, the Court finds that the Defendant believed its interpretation to be correct, and that such belief was "reasonable". As shown by the discussion earlier in this opinion, the determination as to whether waiting time is work time in a given case can and does present issues of great difficulty. This difficulty is well illustrated by one of the interpretative bulletins issued by the Secretary of Labor covering fact situations analogous to this one. That interpretative bulletin, codified at 29 C.F.R. § 785.23, states:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home [citations omitted].

This interpretative bulletin was one of the sources relied upon by the Defendant in formulating its policy regarding overtime pay.[5] The other source consisted of court interpretations of the concept of work time in fact situations which the Defendant considered to be analogous to this one.[6] From the record as a whole, the Court finds that the Defendant did act in good faith and in the reasonable belief that its interpretation

of the law and regulations was correct. Because this is a close case, and one as to which reasonable minds might differ, the Court finds that no liquidated damages should be awarded.

■ The last legal question to be decided is that of prejudgment interest. The law is well established in this circuit that in an action under 29 U.S.C. § 217, prejudgment interest should be allowed on the amount found to be due. *Marshall v. Lancarte,* 632 F.2d 1196, 1199 (5th Cir.1980); *Usery v. Associated Drugs, Inc.,* 538 F.2d 1191, 1194 (5th Cir.1976); *Brennan v. City Stores, Inc.,* 479 F.2d 235, 241 (5th Cir. 1973). The failure to award prejudgment interest would probably be an abuse of discretion. *Usery v. Associated Drugs, Inc., supra* at 1194; *Donovan v. Sovereign Security Limited,* 726 F.2d 55, 58 (2nd Cir.1984). The Court's previous finding that the Defendant acted in good faith in this case does not preclude the award of prejudgment interest. *Brennan v. City Stores, Inc., supra* at 242.

In Paragraph XII of the Pretrial Order in this case, the Plaintiff and the Defendant agreed to postpone the determination as to the number of employees entitled to back wages and the amount of back wages due until such time as the Court ruled on the liability issues in this case. The parties should now be allowed a reasonable time within which to submit their calculations concerning the amount of back wages due. The following Orders should be entered.

It is ORDERED that the Defendant El Paso Natural Gas Company be, and it is hereby, permanently restrained and enjoined from employing any employee in commerce or in the production of goods for commerce, or in an enterprise engaged in commerce, or in the production of goods for commerce, for work weeks longer than forty hours, unless the employee receives compensation for his employment in excess of forty hours at a rate not less than one and one-half times the regular rate at

---

5. Defendant's Brief, pp. 6–8.

6. Defendant's Brief, pp. 8–13.

which he is employed, as required by Section 7 of the Fair Labor Standards Act.

It is further ORDERED that the Defendant be, and it is hereby, restrained and enjoined from withholding payment of overtime compensation due the employees involved in this suit, together with interest thereon at the rate of nine (9) percent per annum from the date such unpaid compensation became due until the date it is paid.

It is further ORDERED that the Plaintiff and the Defendant file within thirty (30) days of the date of this Order their respective calculations as to the amounts of back wages due the employees of the Defendant involved in this suit.

It is further ORDERED that, pursuant to 29 U.S.C. § 260, no liquidated damages be awarded in this case.